**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **DEXTER ANTHONY MCGRIFF,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-0087-CVE-PJC |
| | ) | |
| **AMERICAN AIRLINES, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court is defendant American Airlines, Inc's Motion for Summary Judgment (Dkt. # 24). Defendant moves for summary judgment on plaintiff Dexter McGriff's claims of hostile work environment, unlawful termination, and constructive discharge brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e - 2000e-17 ("Title VII").

**I.**

McGriff, an African-American, began work with American Airlines ("American") in June 1998 as a warehouse clerk at American's Maintenance and Engineering Base in Tulsa, Oklahoma. In September 2000, American promoted McGriff to the position of aircraft cleaning supervisor. In that role, McGriff managed between fifty and eighty American employees responsible for cleaning aircraft. He reported to Bernie Gareis, who acted as the direct supervisor for McGriff and Tammy Pitts, an African-American woman and the second fleet service supervisor.

McGriff claims that during approximately the last year and a half of his employment with American, he was subject to a hostile work environment because of his race. He identifies Gareis as the source of most of the racial animus present in his work space, alleging that Gareis subjected McGriff and Pitts to heightened scrutiny because of their race and decreased the number of employees under McGriff's supervision. According to McGriff, Gareis used the terms "black boys" and "lazy black SOB" on separate occasions to refer to African-American employees and laughed and joked about the use of other racial epithets, including the word "Pecos" to refer to Mexicans and the phrase "jewing down a price." McGriff did not report these remarks to either another supervisor or the Human Resources department at American. He did, however, inform Gareis that he was offended by Gareis's reference to American employees as "black boys" and the jokes made about derogatory references to Mexicans and Jews.

The events prompting McGriff's departure from American began August 29, 2003. Gareis, having searched unsuccessfully for McGriff in his work area, pulled security gate records, which reflect the dates and times employees are physically present on the base. According to American, Gareis's review of those records revealed that McGriff was frequently off the base during his designated eight hour shift, even though McGriff regularly submitted time records indicating that he had completed eight hour work days.

On the morning of September 2, 2003, Gareis confronted McGriff regarding the time records and notified McGriff that his conduct was in violation of American company policy. Gareis told McGriff that Gareis would have to inform John Eberstein, a managing director, of McGriff's infractions. As McGriff recalls the encounter, Gareis, upon his departure from McGriff's office that

morning, offered McGriff the option of resigning or being terminated. McGriff proceeded to craft a resignation letter.

Later that day, Gareis returned to McGriff's office with Jack Wing, a Human Resources Investigator for American. Wing informed McGriff that American would hold him out of service while the company investigated the matter. He warned McGriff that the situation "did not look good," but assured McGriff that American would investigate the matter and then make a determination on the status of McGriff's employment. McGriff expressed his dissatisfaction with the circumstances and handed Wing the typewritten resignation letter. Shortly following his resignation from American, McGriff unsuccessfully attempted to rescind that resignation.

McGriff takes issue with American's handling of the dispute. He insists that on the day at issue, Gareis had given McGriff permission to be off base. He also represents that other, non-African-American employees were permitted to be off base for extended periods without reprisal. Although McGriff concedes that he was aware that the company investigation process would have permitted him to contest the claims made by Gareis, he nevertheless insists that he was pressured to resign by Gareis and Wing, who he claims informed him he would not work in the airline industry again if he did not resign.

McGriff brought suit against American under Title VII, alleging the existence of a hostile work environment, unlawful termination, and constructive discharge. American moves for summary judgment on the grounds that: (1) McGriff cannot establish a prima facie case of hostile work environment race discrimination under Title VII; (2) McGriff cannot establish a prima facie case of disparate treatment racial discrimination under Title VII because the airline's actions were based on

3

legitimate non-discriminatory reasons; and (3) McGriff cannot establish a prima facie case of constructive discharge under Title VII.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could

4

reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

While Title VII makes no express mention of a hostile work environment, a victim of such an environment may nevertheless bring a cause of action under Title VII. Ford v. West, 222 F.3d 767, 775 (10th Cir. 2000). In order to avoid summary judgment on a hostile work environment claim, a plaintiff must demonstrate that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Jones v. Barnhart, 349 F.3d 1260, 1268 (10th Cir. 2003) (internal citation marks omitted). In determining whether this showing has been met, the Court examines the totality of the circumstances, assessing the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. Id. The complained of environment must be evaluated both objectively and subjectively, McCowan v. All Star Maint., Inc., 273 F.3d 917, 923 (10th Cir. 2001), that is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). Since American has raised the issue of its liability for Gareis's actions, the Court considers both whether his conduct created

5

a hostile work environment and whether McGriff has established a basis for holding American liable for that conduct.

**A.**

All of McGriff's complaints stem from an increasingly acrimonious relationship with his supervisor, Gareis. Although the record is not clear as to the precise dates of each incident, McGriff traces the beginnings of his problems to a staff meeting held in 2002. Expressing frustration with the presence of certain African-American members of McGriff's crew in the area break room, Gareis told McGriff: "I want you to get them black boys out of that break room." Plaintiff's Objection to the Defendant's Motion for Summary Judgment and Brief in Support (hereinafter "Plaintiff's Response") (Dkt. # 34), Ex. A, Deposition of Dexter Anthony McGriff (hereinafter "McGriff Deposition"), at 75-76. McGriff testified that he confronted Gareis, and Gareis reacted angrily:

> And this guy, he jumped up, walked over to me. He's about 6[']4['']. And he said, are you calling me a mother fucking racist? . . . He shut the door and he said, I'm going to tell you now, you listen to me, you will never be promoted under me. In fact, he said I'll demote before I'll promote you. And he said, if you think you're going to call me a mother fucking racist and get away [with] it, you got another thin[g] coming, do I make myself clear. . . . And he told me, he said, I will fire you. I will fire you.

Id. at 76-77.

McGriff describes a progressively troubled relationship with Gareis. McGriff complains that, in February 2003, after reviewing a pamphlet distributed by the Transport Workers Union on racially offensive language in the workplace, Gareis and another American employee made jokes and laughed about certain racial slurs and remarks, including the use of the term "Pecos" to refer to Mexicans and the phrase "jewing down a price." Id. at 182. During that same meeting, in the course of a discussion with another supervisor about African-Americans' feelings about the use of the word

6

"nigger," Gareis, looked at McGriff and remarked, pointedly, "well, they don't like being called a boy either." Id. McGriff told the employees in attendance, including Gareis, that he found the conversation offensive, but did not pursue any of the formal complaint channels available at American.

McGriff also points to comments Gareis made, in his presence, about other African-American employees. Gareis, he says, referred to an African-American employee as a "black lazy S.O.B," id. at 207, and directed a white supervisor to prevent two African-American employees from speaking with vendors while performing their jobs because, Gareis stated, they were not "good communicators" and were unable to articulate themselves well. Id. at 209. McGriff testified, however, that Gareis never directed any racial slurs at him. Id. at 212.

Finally, McGriff claims Gareis effectively undermined his authority as a supervisor by subjecting him and Pitts to selective monitoring and removing from his supervision certain members of the parts cleaning operation. Both McGriff and Pitts testified that a fellow employee informed them that Gareis had asked dock clerks, schedulers, and planners on base to monitor McGriff and Pitts' work and report back to him. Id. at 72; Id. at Ex. B, Deposition of Tammy Pitts, at 12-13. He further insists that Gareis negatively affected his work environment by giving a supervisor function to McGriff's crew chief, Plaintiff's Response (Dkt. # 34), Ex. A, McGriff Deposition, at 78, 211-12, and by transferring responsibility for the parts washers and building cleaners to white

supervisors. Defendant American Airlines Inc.'s Motion for Summary Judgment (hereinafter "Motion for Summary Judgment"), Ex. 24, McGriff Deposition, at 216.[1]

The standard applied to hostile work environment claims is a disjunctive one requiring a showing that the harassing conduct was either sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of McGriff's employment. Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1414 (10th Cir. 1997).[2] As a starting point, the Court determines that McGriff has not raised a genuine issue of material fact as to the pervasiveness of the alleged racial hostility. McGriff identifies four remarks Gareis made over the course of approximately a year. None of the comments, though made in McGriff's presence, was directed at him. Gareis's remarks do not collectively form the "steady barrage of opprobrious racial comment," Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994), that would, together, create pervasive hostility in a work environment.

The Court reaches a different conclusion on the severity question. The totality of the circumstances analysis commanded under Title VII requires a court to consider "all of the circumstances relevant to the discrimination to determine if the conduct was sufficiently severe to

---

[1] The Court recognizes that American has not conceded that any of these events occurred. In fact, defense counsel challenged McGriff's recollection of Gareis's use of the term "black lazy SOB" to refer to another African-American employee. Motion for Summary Judgment (Dkt. # 24), Ex. A, McGriff Deposition, at 206-07. For the purposes of summary judgment, the Court construes the record in the manner most favorable to the non-moving party, in this case, McGriff. McCowan, 273 F.3d at 921("A tenet of summary judgment review . . . requires we indulge all reasonable inferences in the nonmovant's favor.").

[2] Although Smith involved a claim of sexual harassment, the Supreme Court has endorsed the use of equivalent standards for racial and sexual harassment claims, when possible. See Faragher, 524 U.S. at 787 n.1 ("Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment.").

8

constitute a hostile work environment." Smith, 129 F.3d at 1414; see also McGowan, 273 F.3d at 925 ("Such a thorough examination of the record is required because the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation."). Gareis's comments, however sporadic, must be considered in their context, and the Court concludes that, taken together, McGriff's allegations raise a genuine issue of material fact as to both the subjective and objective severity of his work environment.

As to McGriff's subjective view of his treatment by Gareis, McGriff testified that after Gareis's initial reaction to McGriff's challenge of his use of the term "black boys," he was afraid that Gareis would terminate his employment, as he had threatened. Motion for Summary Judgment (Dkt. # 24), Ex. A, McGriff Deposition, at 77-78. This fear generated further stress, which he claims infected his family life. Id. at 142-43. He further testified that he felt like a "flunky" when Gareis allegedly caused his crew chief to report to Gareis directly instead of reporting to McGriff. Id. at 79. McGriff has offered evidence that Gareis's conduct produced some amount of emotional distress for McGriff, and the law does not require a greater showing. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993) ("Title VII comes into play before the harassing conduct leads to a nervous breakdown."); Smith, 129 F.3d at 1413 ("Plaintiff is not required to prove that her tangible productivity or work performance declined or that her ability to do her job was impaired by [harassing] behavior.").

The harassing conduct must also be objectively severe, such "that a reasonable person would find the work environment hostile or abusive." Id. When McGriff initially confronted Gareis regarding his remarks, Gareis took umbrage with the suggestion that his remark evidenced racist tendencies and angrily threatened McGriff with demotion and termination. Gareis later made an

9

ostensibly mocking reference to the heated exchange, in the context of a conversation in which he laughed about the use of racial slurs.  If McGriff's allegations are to be believed, Gareis also engaged in questionable exercises of his supervisory authority against McGriff, selectively monitoring his work[3] and decreasing the number of employees under his authority.  These actions bear greater significance because they were taken by a supervisor who possessed the power to alter McGriff's work responsibilities, schedule, and to give effect to his threats of termination.  See Faragher, 524 U.S. at 805 (noting that "the acts of supervisors have greater power to alter the environment than acts of co[-]employees generally").  The Court concludes that McGriff has raised a genuine issue of material fact that a reasonable person, faced with the circumstances outlined above, would have perceived his work conditions to be sufficiently severe to constitute a hostile or abusive work environment based on race.

**B.**

Having concluded that McGriff has presented sufficient evidence to persuade a rational trier of fact that Gareis created a hostile work environment severe enough to alter McGriff's work conditions, the Court must still determine whether McGriff has established a basis for American's

---

[3]  American points to Trujillo v. University of Colorado Health Sciences Ctr., 157 F.3d 1211 (10th Cir. 1998), as support for its claim that McGriff's allegations of monitoring do not constitute sufficient evidence of racial animus to withstand summary judgment.  In Trujillo, the Tenth Circuit affirmed the district court's grant of summary judgment against a plaintiff claiming a hostile work environment, but made clear that its decision was based in large part on Trujillo's failure to offer any evidence that the alleged harassment stemmed from racial animus.  Id. at 1214 ("Plaintiff's list of grievances includes none of the racial comments or ridicule that are hallmarks of hostile work environment claims. . . . Had Plaintiff presented more persuasive evidence that his alleged harassment stemmed from racial animus, we may have disposed of his appeal differently.").  Here, the Court is confronted with allegations of monitoring in addition to racially derogatory remarks and a threat of termination when McGriff challenged his supervisor's use of questionable language.

liability for the acts of Gareis.  Ford, 222 F.3d at 775 ("To survive summary judgment under Title VII, the record must support an inference of a racially hostile work environment and a basis for employer liability.").  In light of the Supreme Court's holdings in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), Faragher, and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), that determinations of employer liability for workplace harassment should be governed by agency principles, the Tenth Circuit has recognized three bases for employer liability for a hostile work environment created by a supervisor or co-worker's racial harassment.  An employer, like American, may be held liable for the violations of Title VII committed by its employees where: (1) the conduct occurred within the transgressor's scope of employment; (2) the employer knew, or should have known about the violation and failed to respond in a reasonable manner; or (3) the transgressor acted with apparent authority or was aided by the agency relationship.  Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1269 (10th Cir. 1998)  Only the first and third grounds for liability are implicated in the present case.

The Court begins with the question of whether Gareis acted within the scope of his employment when he engaged in the activities of which McGriff accuses him.  In Burlington Industries, the Supreme Court articulated the "general rule" that " harassment by a supervisor is not conduct within the scope of employment."  524 U.S. at 757.  The Court observed, however, that there are circumstances in which a supervisor engages in unlawful discrimination "with the purpose, mistaken or otherwise, to serve the employer."  Id.; see also Wright-Simmons, 155 F.3d at 1270 (observing that the Court in Burlington Industries declared that discriminatory, harassing conduct occurs in the scope of employment if it is motivated with the intent to serve the employer).

11

As to the racial remarks made by Gareis, McGriff has offered no evidence that Gareis made those statements in service to American and, thus, within the scope of his employment. McGriff does not contend that American maintained a culture wherein the use of racially offensive language was encouraged for a corporate or any other purpose. In fact, the sole evidence as to American's views on the subject is a policy statement issued by American outlining its policy against unlawful harassment, including "verbal conduct such as the use of epithets." Motion for Summary Judgment (Dkt. # 124), Ex. F, American Airlines Policy Statement Against Unlawful Harassment (hereinafter "Policy Statement"). The Policy Statement includes a strict prohibition on such verbal conduct and other forms of harassment. Id. ("Unlawful harassment of any kind is not condoned by American and will not be tolerated in the work place."). Nor has McGriff offered any evidence that Gareis's racially selective monitoring of McGriff and Pitts or his decision to strip them of certain supervisory responsibilities were acts taken in service of American.[4]

The Courts have also recognized a basis for vicarious liability when a supervisor engages in harassing conduct with apparent authority or aided by virtue of his agency relationship with the

---

[4] The scope of employment test, as applied in this case, requires a difficult showing. To the extent that McGriff argues, as he does, that Gareis's monitoring of his work was motivated by racial animus, it becomes much harder to claim that Gareis was acting within the scope of his employment without some kind of evidence that American had a policy, spoken or unspoken, of meting out unequal treatment to African-American employees or that there was some overarching discriminatory ethos animating the American work force. See Wright-Simmons, 155 F.3d at 1270 ("For instance, a supervisor who discriminates based on race in job assignments in order to placate the prejudice pervasive in the labor force would be acting within the scope of employment."). For that reason, at least one court has noted that the legal principle is easier to state than to apply. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 151 n.6 (3d Cir. 1999) ("[S]cope of employment is not a sharply delineated concept in law or logic, and that is what makes it so troublesome."). Since McGriff has offered no such evidence of any kind that Gareis was acting in aid of American when he committed the acts alleged, the Court does not speculate on the possible motivations for his acts.

employer. Wright-Simmons, 155 F.3d at 1271.  An employer is vicariously liable for an actionable hostile environment when that environment is created by a supervisor with "immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807.

There is no dispute as to Gareis's status as McGriff's supervisor.  The liability inquiry does not end there, however, for American has claimed the protection of the so-called Faragher/Ellerth defense,[5] an affirmative defense available to an employer when there has been no "tangible employment action"[6] against an employee. An employer pleading the defense must demonstrate that (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Id.

There is no genuine issue of material fact as to American's efforts to prevent and correct racial harassment amongst its employees.  American has offered as evidence a copy of its Policy Statement, which expresses American's commitment to providing a workplace free of unlawful harassment and which provides a listing of protected traits as well as a non-exhaustive list of the forms unlawful harassment might take.  Motion for Summary Judgment (Dkt. # 24), Ex. F, Policy

---

[5] American's summary judgment motion does not provide an extensive discussion of its claim, but among the defenses contained in its answer is its assertion that it "exercised reasonable care to prevent and promptly correct any discriminatory behavior and that Plaintiff unreasonably failed to take advantage of any preventative measures provided by Defendant." Answer (Dkt. # 8), at 5.

[6] This affirmative defense is unavailable if there is evidence of a "tangible employment decision," since, then, the supervisor's tangible act -- of termination, for example -- is effected through the use of the employer's authority, and his action is, in effect, the act of the employer.  Burlington Indus., 524 U.S. at 761-62.  Because the Court determines, as outlined infra, that McGriff resigned his employment and has not offered evidence of any other tangible employment action, it does not address this issue.

Statement. The Policy Statement also includes information on the appropriate divisions to which to forward complaints of unlawful harassment. Id. McGriff signed a copy of the Policy Statement, indicating his understanding of the company's existing anti-harassment policy and testified at his deposition that he was aware of the policy during his time at American. Id. at Ex. A, McGriff Deposition, at 70-72. McGriff has not offered any countervailing evidence demonstrating that American's policy did not constitute a reasonable attempt to prevent or correct unlawful harassment.

As to the second prong of the affirmative defense, McGriff testified to reporting only three incidents. In the case of Gareis's use of the terms "black boys" and "Pecos" and the phrase "jewing it down," he informed Gareis that he considered the comments racially offensive. Faced with Gareis's unresponsiveness, McGriff did not pursue recourse via the other channels provided under American's harassment policy. Assuming McGriff possessed understandable reservations about confronting Gareis, the American reporting procedure permitted him to express his concerns to a division Human Resources Manager, the manager of Affirmative Action, or the AMR Business Abuse Hotline. Motion for Summary Judgment (Dkt. # 24), Ex. F, Policy Statement. Indeed, McGriff could have bypassed Gareis altogether, as the policy does not delineate a required sequence, or hierarchy, of contacts.

The Court does not believe that the Faragher/Ellerth defense requires a harassed employee to make repeated complaints, even if those complaints go unheeded. Under the circumstances presented in this case, however, McGriff's decision to raise a protest solely with Gareis -- by his account, his principal tormentor -- and not seek relief through any of the additional, available channels at American was unreasonable. McGriff has presented no evidence showing otherwise.

14

As to the remaining allegations, there is no evidence that McGriff reported any of that discriminatory conduct.[7] Without such evidence, American is entitled to summary judgment on the basis of its affirmative defense to McGriff's claim of hostile work environment. Faragher, 524 U.S. at 807-08 ("[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [Faragher/Ellerth] defense.").

The Court concludes that McGriff has sufficiently raised a genuine issue of material fact as to the severity of the racial harassment he suffered at the hands of Gareis and that Gareis's authority as his supervisor qualifies American for vicarious liability for Gareis's acts. The Court determines, however, that American has successfully demonstrated the absence of a genuine issue of material fact as to its entitlement to the Faragher/Ellerth affirmative defense to Title VII liability. Accordingly, summary judgment is appropriate on McGriff's claim of hostile work environment.

---

[7] Tammy Pitts, not McGriff, reported to Wing in Human Resources that she and McGriff felt that they were being subjected to heightened scrutiny because of their race. Wing encouraged Pitts to discuss the situation with Gareis. Both Pitts and McGriff did so. According to McGriff's testimony, when he spoke with Gareis, Gareis stated that he understood McGriff's concerns and that he would "work on doing something different." Motion for Summary Judgment (Dkt. # 124), Ex. A, McGriff Deposition, at 75. McGriff testified that Gareis's monitoring ceased subsequent to that conversation. Id. See Faragher, 524 U.S. at 806 ("It would therefore implement clear statutory policy and complement the Government's Title VII enforcement efforts to recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty.").

**IV.**

In order to succeed on a claim of unlawful termination on the basis of race,[8] a plaintiff must, first, establish a prima facie case of discrimination by demonstrating the following: (1) he is a member of a protected class; (2) he was qualified and satisfactorily performing his job; (3) he was terminated under circumstances giving rise to an inference of discrimination. Salfuero v. City of Clovis, 366 F.3d 1168, 1175 (10th Cir. 2004). If plaintiff makes that showing, the burden shifts to defendant to provide a legitimate non-discriminatory reason for its actions against plaintiff. Id. If defendant meets that burden, plaintiff must demonstrate that the proffered explanation is pretext for unlawful discrimination. Id.

The undisputed evidence makes clear that American did not terminate McGriff; he resigned. According to McGriff's testimony, when Gareis confronted him on September 2, 2003 regarding the alleged inconsistencies in his time sheets and presented him with the choice between resignation and termination, McGriff drafted the following letter on American stationery:

> Dear Mr. Gareis,
>
> Due to events, which have transpired in my personal life over the last several months, I am unable to continue my employment with American Airlines. In the five years that I've been employed by American Airlines I've gained many experiences and accomplished many goals. I leave my Department fully believing we have one of the most efficient Aircraft Cleaning units in the American Airlines system. I've come to know many colleagues and friends in these five years and I will truly miss each of them.

---

[8] McGriff's response contains no mention of his unlawful termination claim and offers no response to the arguments put forth in American's motion for summary judgment. His amended complaint alleges that American terminated him in violation of 42 U.S.C. § 2000e and that "he was treated differently than similarly situated white employees and was terminated for a pre-textual reason." Amended Complaint (Dkt. # 3), at 3.

> I want to thank American Airlines for allowing me the opportunity to work for the world's largest and best Airline. In closing I believe in American Airlines and I'm convinced American Airlines greatest days are yet ahead.
>
> May God bless American Airlines and the entire American Airlines family. I bid you farewell.
>
> Sincerely,
>
> Dexter Anthony McGriff, Sr.

Motion for Summary Judgment (Dkt. # 24), Ex. D, McGriff Resignation Letter. McGriff presented this letter to Wing when he returned to McGriff's office later in the afternoon. McGriff testified that as of September 2, 2003, he knew that American had accepted his resignation and that his employment with the airline was over. Id. at Ex. A, McGriff Deposition, at 168.

Because there is no evidence that American terminated McGriff's employment, the Court need not consider further his unlawful termination claim, and grants summary judgment as to that claim.

## V.

"An employee who is not formally discharged from employment may still be constructively discharged if the employee was forced to quit due to race-based intolerable working conditions." Bolden, 43 F.3d at 552. The conditions complained of must be "objectively intolerable," and a plaintiff's subjective view of the situation is irrelevant. Sanchez v. Denver Pub. Sch., 164 F.3d 527, 534 (10th Cir. 1998).

McGriff does not link the events forming the basis of his hostile work environment claim to the cessation of his employment on September 2, 2003 and makes no argument that Gareis's conduct was so egregious that he felt compelled to leave his employment. Instead, he bases his claim of constructive discharge on the exchange between himself and Gareis and Wing on September 2. That

17

morning, Gareis approached McGriff about McGriff's absence from the base the preceding Friday. Gareis pointed out what he considered to be McGriff's excessive absences from the work site and failure to accurately record his hours and informed McGriff that his absences constituted violations of company policy. Gareis told McGriff: "Dexter, here is the bottom line, either you resign or you're going to be terminated and you'll never work in the airline industry again. If you resign there may be a possibility that we can give you a recommendation." Plaintiff's Response (Dkt. # 34), Ex. A, McGriff Deposition, at 133. When Gareis left McGriff's office, McGriff crafted his resignation letter. Later that afternoon, Gareis returned to McGriff's office with Wing. McGriff described the following conversation:

> A: To the best of my knowledge, what Jack told me is that Dexter, we have a job here. I'm going to remove you from service and I'm investigating some charges here that have been brought to me by Bernie Gareis against you. . . Again I was told, look, if you resign we'll give you a recommendation but basically you're being fired. This is it. . . .
>
> Q: Are you giving me a direct quote?
>
> A: Yes.
>
> Q: That you are –
>
> A: Yes, sir.
>
> Q: -- not you will be fired?
>
> A: No.
>
> Q: Or things aren't looking good or anything like that?
>
> A: Jack Wing told me that, you know, it didn't look good for you. Now, this is after what Bernie said, basically, you're being fired. And I never – it broke me right there. Jack Wing said, well, well, well, well, well, well, well, wait, we got to investigate this, but it doesn't look good. My suggestion is that, you know, let's complete the investigation and let's just see, but, you know, this is a violation here, and it's not

>going to look good. It just, you know, I can't tell you if you're going to win this or
>not, but it don't – it don't look good, that's what Jack was saying, okay.

Motion for Summary Judgment (Dkt. # 24), Ex. A, McGriff Deposition, at 134-35. McGriff then handed Wing his resignation.

Although McGriff insists that Gareis and Wing put him to an impossible choice, he was not faced with resignation or sure termination. However daunting the prospect of an investigation process may have seemed, McGriff retained the choice to pursue that course and defend his record, and was aware that he retained that choice. Id. at 237.

In any event, the Tenth Circuit has recently stated that "even requiring an employee to choose between resignation and termination is not necessarily a constructive discharge, unless the employee's decision is, for some reason, involuntary." Exum v. United States Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004).[9] Voluntariness is judged by an objective standard, where the Court evaluates whether an employee's working conditions were so intolerable that a reasonable employee would have had "no other choice but to quit." Id. at 1135-36. Plaintiff has not produced evidence to this effect. Moreover, McGriff's claims that Gareis's behavior was so unbearable that he was forced to resign is severely undercut by his attempt to return to work immediately following his resignation.

**VI.**

---

[9] Exum was a claim under 42 U.S.C. § 1981. The standards and burdens for section 1981 are the same for those brought under Title VII. Aramburu v. Boeing Co., 112 F.3d 1398, 1410 (10th Cir. 1997).

**IT IS THEREFORE ORDERED** that American's motion for summary judgment (Dkt. # 24) is hereby **granted**. Accordingly, the pretrial set for May 4, 2006 at 9:30 a.m. and the trial set for May 15, 2006 at 9:30 a.m. are stricken.

**DATED** this 2nd day of May, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT